**Gary M. STRAWHACKER, Plaintiff,**

v.

**Kenneth S. APFEL,[1] Commissioner of Social Security, Defendant.**

**No. 3–97–CV–90184.**

United States District Court,
S.D. Iowa,
Davenport Division.

Aug. 20, 1998.

---

1. President Clinton appointed Kenneth S. Apfel to serve as Acting Commissioner of Social Security, effective September, 29, 1997, to succeed John J. Callahan. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Kenneth S. Apfel is hereby substituted for John J. Callahan as defendant in this action.

Michael DePree, Davenport, IA, for Plaintiff.

Inga Bumbary–Langston, Asst. U.S. Atty., Des Moines, IA, for Defendant.

## MEMORANDUM OPINION AND ORDER

PRATT, District Judge.

Plaintiff, Gary M. Strawhacker, filed a Complaint in this Court on October 28, 1997, seeking review of the Commissioner's decision to deny his claim for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 401 (1994). This Court may review a final decision by the Commissioner. 42 U.S.C. § 405(g). For the reasons set out herein, the Commissioner's decision is reversed and remanded for further proceedings.

## BACKGROUND

Plaintiff filed an application for disability benefits on November 4, 1994, claiming an onset of disability date of October 23, 1993. Tr. at 95–97. His application was denied initially and upon reconsideration. After a hearing (Tr. at 45–78), Administrative Law Judge Thomas M. Donahue (ALJ) issued a decision on June 21, 1996, denying benefits. Tr. at 15–31. After the hearing, additional evidence (Tr. at 193–210), including a residual functional capacity form completed by the treating physician (Tr. at 206–210), was submitted to the Appeals Council. The Appeals Council received and considered the new evidence, but found no basis for granting review. Tr. at 4. On September 27, 1997, the Appeals Council denied Plaintiff's request for review of the ALJ's decision. Tr. at 4–5.

Plaintiff was born December 19, 1943. At the time of his application, he was 50 years old. Tr. at 95.

On October 23, 1993, Plaintiff's was admitted to St. Luke's Hospital after being involved in an automobile accident in which he had been "hit in a T-bone' fashion by another car." Tr. at 135. During the examinations that day, it was noted that Plaintiff's past medical history was significant for difficulty with spine arthritis. Tr. at 138. On October 30, 1992, Plaintiff underwent a left suprascapular nerve block, and multiple myofacia trigger point injections to the para-cervical and mid thoracic areas to treat a cervical pain syndrome secondary to degenerative cervical spine disease with congenital abnormalities. Tr. at 133. A medical office note, dated November 4, 1993, states that Plaintiff complained of neck pain as well as some intermittent numbness in his right leg. The doctor ordered an MRI of the cervical and lumbar spine. Tr. at 141. The MRI of the lumbar spine showed:

1. Probable traumatic herniation of the L3–4 disc into the superior end plate at L4, which is associated with a mild compression fracture, accompanying edema and probably foci of methemaglobin in the mid and antero inferior portion of the vertebral body.

2. Broad based disc bulges at L3–4 and L4–5, more severe at the latter level. Equivocal mild to moderate stenosis at L4–5 generated by a combination of ligamentum flavum hypertrophy and disc material.

3. Questionable lateral protrusion on the right at L4–5 which could approach but does not appear to compress the exiting right L4 nerve root.

Tr. at 142. The MRI of the cervical spine showed:

1. C5–6 degenerative disc disease with signal changes in the adjacent vertebral bodies and posterior marginal osteophytes which produce flattening of the ventral cord at that level.

2. C3–4 assimilation anomaly which conceivably, due to limited motion at this level, relate to the abnormality described in #1.

Tr. at 143.

Plaintiff was seen by Michael H. Laws, M.D. on November 15, 1993, because of neck and back pain. On examination, Plaintiff had "fairly exquisite tenderness of the cervical paraspinals and lumbosacral paraspinals. He has marked limitation of range of motion of the neck." The doctor continued Plain-

tiff's medication, and made arrangements for physical therapy three times a week. Tr. at 154. On December 7, 1993, Plaintiff felt as though he was about 80% better. Tr. at 155. On December 17, 1993, Dr. Laws wrote that Plaintiff was able to return to work on December 20, 1993, with no restrictions. Tr. at 156. Plaintiff saw Dr. Laws on April 26, 1994, for chronic back and neck pain. He was having numbness of the fourth and fifth digits on the right for several weeks. The examination showed marked limitation of movement of the neck, and there was tenderness of the cervical paraspinals, thoracic paraspinals and lumbosacral paraspinals. Dr. Laws made arrangements for another three weeks of physical therapy. Tr. at 158. When he was seen again on August 29, 1994, Plaintiff said that his neck and back pain had gotten more severe to the point that he had to quit his part time job. Plaintiff had diffuse tenderness to palpation of cervical paraspinals as well as cervical and lumbosacral spinous processes. Dr. Laws recommended that Plaintiff return to the pain clinic for additional epidural and trigger point injections. Tr. at 159.

Plaintiff was seen at a pain clinic on September 9, 1994, because of severe neck and low back pain. Tr. at 146–47. At the time of the examination, he had no history of any upper extremity numbness weakness or any other focal symptoms. The lower extremities were also without any neurologic type symptoms. His chief complaint was decreased range of motion of his neck and severe pain, and low back pain. On physical examination, the upper extremities did not reveal any radiculopathy whatsoever. Tr. at 146. The posterior cervical and suprascapular areas bilaterally revealed a fairly severe myofascial spasm and pain. An examination of the low back revealed a diffuse component of myofascial pain in the paralumbar area but no specific myofascial bands. Plaintiff's lower extremities have grossly normal strength, sensation and reflexes throughout. Plaintiff was to begin therapy three times a week for four weeks. He was also scheduled for a cervical epidural steroid injection. Tr. at 147. The epidural injection was administered September 27, 1994. Tr. at 149. Plaintiff returned to the pain clinic on Octo-

ber 25, 1994. "His neck and shoulder pain has improved drastically and he is very happy [with] the amount of improvement he has shown from that injection. He has absolutely no severe pain in the area and no problems in his arms either today." Plaintiff did, however, complain of pain in the mid to lower thoracic area of his back. Tr. at 151. Examination revealed severe parathoracic muscle spasm which was worse on the left than right. The doctor noted "a tremendous amount of rotation of the mid thoracic segments and this intensifies his pain as we would expect." Plaintiff was given another epidural steroid injection. Plaintiff was to begin physical therapy with emphasis on body mechanics, particularly in the cervical and mid thoracic areas. Tr. at 152.

Plaintiff saw Dr. Laws on February 14, 1995 for neck and back pain. On examination, there was marked limitation of range of motion of Plaintiff's neck. Tr. at 189. On March 30, 1995, Dr. Laws wrote "To Whom It May Concern" that Plaintiff's had a permanent disability rating of 10% of the whole body. Tr. at 190. Plaintiff was seen by Dr. Laws on August 21, 1995, at which time he was wearing a lumbar brace which helped the low back "but he feels puts all the pressure on his neck so he is having a lot of neck discomfort." Plaintiff had recently started to have tingling in the fingers of the left hand. Plaintiff said that the hand was weak and that he dropped things. On examination, there was marked limitation of range of motion in the neck with crepitation. Tr. at 191. On January 8, 1996, Dr. Laws wrote a letter to Plaintiff's attorney in which he said that Plaintiff was scheduled for surgery "in the near future". Dr. Laws wrote:

At this time he is unable to carry out his normal work activity. He can sit for short periods of time and walk as tolerated, depending on his level of pain. He should not be bending and lifting any significant weight. Stooping and kneeling would also be extremely difficult. He has no visual limitations and has no difficulty with the use of his arms or hands and to carry out normal work activities with his upper extremities as long as it doesn't require lifting and carrying heavy objects. Obviously

if his condition improves following his disc surgery, it is very likely there may be a significant change in his restrictions for work activity.

Tr. at 192.

The following evidence was submitted to the Appeals Council subsequent to the ALJ's decision. On November 15, 1996, Richard A. Roski, M.D. completed a Medical Assessment of Residual Functional Capacity. Tr. at 206–10. The doctor opined that Plaintiff is only able to lift a maximum of four pounds and can frequently lift 2 pounds. Tr. at 206. Plaintiff can stand/walk for ten minutes at a time for a total of one hour in an eight hour day. Plaintiff can sit for ten minutes at a time for a total of two hours in an eight hour day. The doctor opined that Plaintiff would need to lie down five hours out of an eight hour day. Tr. at 207. The doctor opined that Plaintiff can never climb, crouch, kneel, or crawl, and can occasionally balance, reach overhead, handle, and push/pull. The doctor said that Plaintiff cannot bend forward and downward from the waist. Tr. at 208. The doctor said that Plaintiff could not use either lower extremity for repetitive movement as in operating foot controls. Tr. at 209. Dr. Roski opined that Plaintiff's limitations had lasted, or were expected to last for twelve months, and that he was not able to work at either full or part time work. Tr. at 210.

Plaintiff was seen for an examination by Janet Ryan, M.D. and/or David B. Staub, M.D. on January 15, 1997. Tr. at 198–200. The history states:

Over the last year, he has had two surgeries on his back, the first being in January of 1996 for what he describes as a herniated disc in which he had improvement in his symptoms for about 3 weeks and then had recurrence of low back pain and right-sided radicular symptoms. He had a repeat surgery in June of 1996 with resolution of his right-sided radicular symptoms, however, with new onset of left-sided buttock pain and numbness.

Tr. at 198. After a physical examination, which included review of radiographs (Tr. at 201–205), the Impression was:

1) This is a 53 year old gentleman with back pain that initially improved after sur-gery one year ago for only a short period of time. No improvement after repeat surgery in June with now progression of the x-ray, consistent with monostatic Paget's disease. 2) Chronic neck pain, need to rule out Paget's disease at this level of the spine. 3) Right ear complaints as well as report of bilateral hearing loss, need to rule out skull involvement of Paget's.

Tr. at 199. Plaintiff was seen for an examination by Will G. Ryan, M.D. on June 3, 1997, on referral from Dr. David Staub. Dr. Ryan's history states:

The pain was treated with physical therapy and epidural steroid injections till January 1996 when he had discectomy L4–5 with repeat in June 1996 when he developed a hematoma post op which was evacuated. The pain persists and is getting worse. A diagnosis of? Pagets L4 made recently by bone scan and x-ray not entirely typical and ? Hemangioma. Back pain radiates to right buttock and right lateral thighs.

Tr. at 193. An office note dated June 6, 1997, states that Dr. Ryan discussed Plaintiff's x-ray, MRI, CT, and bone scan with three other doctors. "Dr. Fordham says scan suggest compression with hemangioma unless the fracture is recent. Fracture presumably occurred 3 years ago." It was decided to treat Plaintiff with medication for six months and than repeat the bone scan. Tr. at 194. An Electrodiagnostic study dated October 4, 1996 was mildly abnormal with denervation in the right ostrocnemius which was compatible with S1 radiculopathy. Tr. at 195. On March 6, 1997, Dr. Staub stated that Plaintiff needed a handicapped parking permit because he was severely limited in his ability to walk due to arthritic, neurological, or orthopaedic condition. Tr. at 196. A prescription for a hospital bed was also written on March 6, 1998. Tr. at 197.

After a hearing, at which testimony was taken from Plaintiff, his wife, his daughter, and a vocational expert (Tr. at 45–78), the ALJ issued a decision (Tr. at 15–31) in which he found that Plaintiff's is not precluded from doing his past work as a security guard, and that he has transferable skills from this job (Tr. at 30), and therefore, not disabled.

Tr. at 31. The ALJ held that although Plaintiff had been employed by the security company from September to December, 1993, he had actually only worked at this job until October 23, 1993 when he was injured in the automobile accident. Tr. at 19.

## DISCUSSION

Review of a final decision of the Commissioner of Social Security, is limited to determining if the decision is supported by substantial evidence on the record as a whole, and that the decision is not affected by an error of law. In *Keller v. Shalala*, 26 F.3d 856, 857 (8th Cir.1994), the Court wrote:

> We review the ALJ's findings of fact to determine if they are supported by substantial evidence on the record as a whole. *Nettles v. Schweiker*, 714 F.2d 833, 835 (8th Cir.1983). This standard requires us to determine whether the evidence is such that a reasonable mind might accept it as adequate to support a conclusion, *McMillian v. Schweiker*, 697 F.2d 215, 220 (8th Cir.1983), taking into account evidence that detracts from the finding as well as that which supports it. *Tome v. Schweiker*, 724 F.2d 711, 713, (8th Cir.1984). We must also ascertain whether the ALJ's decision is based on legal error. *Nettles*, 714 F.2d at 835–36.

■ A reviewing court should neither consider a claim de novo, nor abdicate it's function to carefully analyze the entire record. *Brinker v. Weinberger*, 522 F.2d 13, 16 (8th Cir.1975).

In *Mackey v. Shalala*, 47 F.3d 951, 953 (8th Cir.1995), the Court wrote:

> When the Appeals Council has considered material new evidence and none the less declined review, the ALJ's decision becomes the final action of the Secretary.... At this point, our task is only to decide whether the ALJ's decision is supported by substantial evidence in the record as a whole, including the new evidence deemed material by the Appeals Council that was not before the ALJ. As we have noted, "this [is] a peculiar task for a reviewing court." *Riley v. Shalala*, 18 F.3d 619, 622 (8th Cir.1994).

■ In the opinion of the Court, a reasonable mind would not conclude that the evidence in this record is adequate to support the decision that Plaintiff is able to do his past work, or that he has skills that transfer to other work. Furthermore, the finding that Plaintiff is able to return to past relevant work, is erroneous as a matter of law.

The ALJ held, and the evidence supports, that Plaintiff worked as a security guard beginning in September, 1993. When Plaintiff completed a Vocational Report, he stated that he began this job September 25, 1993. Tr. at 104. The ALJ also held that the few days that Plaintiff worked after his injury on October 23, 1993, was an unsuccessful work attempt, and that Plaintiff had not engaged in substantial gainful activity since October 23, 1993. In all of 1993, Plaintiff earned a total of $1,191, 73. The point is that the ALJ found that Plaintiff did the work of a security guard for less than a month. 20 C.F.R. § 404. 1565(a) states: "... We consider that your work experience applies when it was done within the last 15 years, *lasted long enough for you to learn to do it*, and was substantial gainful activity." (Emphasis added) The Dictionary of Occupational Titles (DOT) defines the job of security guard, defined by the vocational expert as DOT number 372.667–034, as a *semi-skilled position* with a specific vocational preparation of "over one month up to and including three months". In other words, Plaintiff's job as a security guard had not "lasted long enough for [him] to learn to do it", and is not part of his past relevant work. The ALJ found that Plaintiff's only other past work, which was unskilled, was precluded because of Plaintiff's exertional limitations. The findings that Plaintiff is able to return to his past relevant work, and has skills which transfer to other work, therefore, are erroneous as a matter of law.

■ Since Plaintiff is unable to do his past work, the burden of proof is on the Commissioner to prove with medical evidence that Plaintiff has a residual functional capacity, and that other work exists in significant numbers that Plaintiff can perform in his impaired condition. *McCoy v. Schweiker*, 683 F.2d 1138, 1147 (8th Cir.1982) (en banc);

*O'Leary v. Schweiker,* 710 F.2d 1334, 1338 (8th Cir.1983). See also, *Davis v. Callahan,* 985 F.Supp. 913 (S.D.Iowa1997) and cases cited therein.

The ALJ held that Plaintiff has a residual functional capacity for light work. See 20 C.F.R. 404.1567(b). In the opinion of the Court, having reviewed the entire record, this finding was not based on medical evidence but rather on a credibility finding. A credibility finding is not equivalent to proving residual functional capacity with medical evidence. *Soth v. Shalala,* 827 F.Supp. 1415, 1417 (S.D.Iowa1993).

The medical evidence submitted to the Appeals Council certainly detracts from the finding that Plaintiff has a residual functional capacity for light work, and the Medical Assessment of Residual Functional Capacity form, completed by Dr. Roski on November 15, 1996, would not support a finding that Plaintiff can work at all. The Court, however, cannot say with certainty that Plaintiff was disabled through the entire time for which he claims benefits. Indeed, in late 1993, Plaintiff indicated that he noted improvement, and in December, 1993, Plaintiff was told he could return to work with no restrictions. By August 1995, however, Plaintiff was wearing a lumbar brace, and thereafter underwent two surgeries on his back.

On remand, the ALJ and Plaintiff's counsel shall work together to obtain all of the medical evidence during the claimed period of disability. In *Battles v. Shalala,* 36 F.3d 43; 44 (8th Cir.1994), the Court wrote: "The goals of the Secretary and the advocates should be the same: that deserving claimants who apply for benefits receive justice." The reports of surgery, for example, do not appear in the record. Nor, can the Court find medical opinion of Plaintiff's residual functional capacity prior to Dr. Roski's November 15, 1996 opinion, and he does not state at what point Plaintiff became as disabled as indicated therein. The evidence does not show when Plaintiff began wearing the back brace, or who prescribed it. Furthermore, the parties should keep in mind that the evidence shows that Plaintiff suffers from a progressive condition. Just because Plaintiff may not have been disabled during the entire time since he last engaged in substantial gainful activity, does not mean that his condition did not, at some point, rise to the level of disability. Medical opinions should be obtained from Plaintiff's treating physicians to determine at what point Plaintiff lost the ability to work. At any time that the ALJ finds that Plaintiff is limited to sedentary work, Rule 201.12 of the medical vocational guidelines (20 C.F.R. Part 404, Subpart P, App. 2) directs a finding of disabled.

Defendant's motion to affirm the Commissioner is denied. **This cause is remanded to the Commissioner for a new decision consistent with this opinion.**

The judgment to be entered will trigger the running of the time in which to file an application for attorney's fees under 28 U.S.C. § 2412(d)(1)(B) (Equal Access to Justice Act). *See Shalala v. Schaefer,* 509 U.S. 292, 113 S.Ct. 2625, 125 L.Ed.2d 239 (1993).

---

1. President Clinton appointed Kenneth S. Apfel to serve as Acting Commissioner of Social Security, effective September, 29, 1997, to succeed John J. Callahan. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Kenneth S.